AO 106 (Rev. 01/09)  Application for a Search Warrant



FILED
Clerk
District Court

FEB - 2 2016

for the Northern Mariana Islands
By_____
(Deputy Clerk)

# UNITED STATES DISTRICT COURT

### for the

### District of Northern Mariana Islands

|  |  |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| https://www.facebook.com. ▇▇▇ | ) |
| | ) |
| THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK, INC. | ) ) |

Case No.   MC ▇▇▇▇▇▇▇

FILED
Clerk
District Court

JAN 12 2021

for the Northern Mariana Islands

(Deputy Clerk)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the _____Northern_____ District of _____California_____ *(identify the person or describe property to be searched and give its location):*

See Attachment A, incorporated fully herein.

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:  See Attachments A & B, incorporated fully herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of ____18____ U.S.C. § ____2252(a)(2)____ , and the application is based on these facts:

See attached Affidavit in Support of an Application for a Search Warrant.

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Everette Route, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  Feb. 2, 2016

*Judge's signature*

City and state:  Saipan, MP

Ramona V. Manglona, Chief Judge
*Printed name and title*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTHERN MARIANA ISLANDS

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH

**https://www.facebook.com.** ▓▓▓▓▓

THAT IS STORED AT PREMISES
CONTROLLED BY FACEBOOK, INC.

Case No. _____

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Everette Route, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      Your Affiant makes this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID/web address that is stored at premises owned, maintained, controlled, or operated by Facebook, Inc. ("Facebook"), a social networking company headquartered at 151 University Avenue, Menlo Park, California, 94301.    The information to be searched is described in the following paragraphs and in Attachment A.   This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

2.      Your Affiant is a Special Agent (SA) with Homeland Security Investigations (HSI) assigned to the office of the Resident Agent in Charge (RAC) office in Saipan, Commonwealth of the Northern Mariana Islands (CNMI).   Your Affiant has been employed by HSI since September of 2014.  Your Affiant has a Master of Public Administration Degree from Midwestern State University in Wichita Falls, Texas and has successfully completed the Criminal Investigator Training Program and HSI Special Agent Training at the Federal Law Enforcement Training Center in Glynco, Georgia.   Prior to his employment with HSI, your Affiant was a Special Agent with the Air Force Office of Special Investigations from 2004-2013.

3.      As a Special Agent, your Affiant is responsible for enforcing federal criminal

statutes including the sexual exploitation of children.  Your Affiant has received training and actual experience relating to federal criminal procedures, federal statutes, and HSI regulations. Your Affiant has received training and instruction in the field of investigation of the sexual exploitation of children and has had the opportunity to participate in investigations relating to the sexual exploitation of children.  The information contained within the affidavit is based on your Affiant's training and experience, and information obtained from other law enforcement agents involved with this investigation including the CNMI Department of Public Safety (DPS).  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of your Affiant's knowledge about this matter.

     4.     Based on your Affiant's training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Section 2252(a)(2), which criminalizes, among other things, knowingly using any facility or means of interstate or foreign commerce to receive visual depictions of minors engaging in sexually explicit conduct, or attempting to do so; and Title 18, United States Code, Section 1470, which criminalizes using any facility or means of interstate or foreign commerce to knowingly transfer or attempt to transfer obscene matter to another individual who has not attained the age of 16 years, knowing that the other individual had not attained the age of 16 years, have been committed by Glenn RUBEN Jr.  There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

//

//

//

//

//

//

//

//

//

**APPLICABLE LAW**

5.      Title 18, United States Code, Section 2252(a)(2) makes it a crime to receive child pornography.  The elements of a violation of 18 U.S.C. § 2252(a)(2) are as follows:

    (a)      the defendant knowingly received a visual depiction of a minor engaged in sexually explicit conduct;

    (b)      the defendant knew that such visual depiction showed a minor engaged in sexually explicit conduct;

    (c)      the defendant knew that such visual depiction involved use of a minor in sexually explicit conduct; and

    (d)      such visual depiction had been mailed, shipped, or transported in interstate or foreign commerce, by any means, including by computer.

6.      Title 18, United States Code, Section 1470 makes it a crime to transfer obscene matter to a minor. The elements of a violation of 18 U.S.C. § 1470 are as follows:

    (a)      the defendant knowingly use any means or facility of interstate commerce to transfer obscene matter;

    (b)      the defendant knew that he was transferring the matter to an individual less than 16-years-old;

    (c)      the defendant knew at the time of the transfer the general nature of the contents of the matter; and

    (d)      the matter was obscene.

7.      In regards to violations of Title 18, United States Code, Section 1470, a matter is "obscene" when an average person, applying contemporary community standards, would find the matter:

    (a)      taken as a whole, appeals to the prurient interest;

    (b)      depicts or describes sexual conduct in a patently offensive way; and

    (c)      taken as a whole, lacks serious literary, artistic, political, or scientific value.

**PROBABLE CAUSE**

8.      On December 26, 2015, DPS Detective Dee Liza S. Udui (Detective Udui), responded to a call of alleged sexual abuse of a minor at a residence in San Roque Village, Saipan, CNMI.  Detective Udui met and interviewed a fourteen (14) year old girl, hereinafter referred to as Y.B.  Y.B. told Detective Udui she met RUBEN, a twenty-two (22) year old Chamorro male, on the Facebook social media website approximately two (2) weeks prior. RUBEN sent Y.B. a "friend request" and Y.B. accepted.  Later, Y.B. and RUBEN began exchanging messages through Facebook Messenger.

9.      Y.B. told Detective Udui that RUBEN asked her numerous times to meet him but that she was unable to do so.  However, on December 25, 2015, at approximately 1900 hours, Y.B. told RUBEN to meet her at the basketball court located by the fire station in San Roque. Y.B. left her residence without permission from her parents and met RUBEN there.  Y.B. stated she and RUBEN sat on the bleachers and talked and eventually started kissing.  Y.B. and RUBEN later moved into the hallway of the abandoned fire station where RUBEN removed Y.B's pants and underwear and they began to have sexual intercourse on a table inside of the abandoned fire station.

10.      On December 26, 2015, at approximately 0800 hours, Detective Udui interviewed RUBEN concerning the above allegations.  After being advised of his Miranda Rights, RUBEN admitted to friending Y.B. on Facebook approximately two (2) weeks ago.  RUBEN stated he and Y.B. started to chat via Facebook Messenger.  RUBEN asked Y.B. her age, and Y.B. replied she was fourteen (14).   RUBEN and Y.B. exchanged photos of each other via Facebook Messenger.  RUBEN asked Y.B. to meet him several times, but they were not able to meet until December 25, 2015, when he and Y.B. met at the basketball court in San Roque.  While sitting on the bleachers, RUBEN began to kiss Y.B. and caress her body, including her vagina. RUBEN said he rubbed Y.B.'s vagina from the outside of her pants, but Y.B. put his hand inside of her pants to touch her vagina.  RUBEN stated Y.B. pulled down her pants and pulled down his pants and they began to have sexual intercourse outside on the bleachers.  RUBEN inserted his penis into Y.B.'s vagina and they later moved inside of the abandoned fire station and continued

to have sex on a table.  RUBEN stated he did not use a condom nor did he ejaculate.  RUBEN admitted that Y.B. was on her menstrual cycle while they were having sex.

11.      RUBEN provided his Facebook username and password and gave Detective Udui consent to review his Facebook account.

12.      On December 28, 2015, Y.B. gave Detective Udui consent to review her Facebook messages between Y.B. and RUBEN, who is known on Facebook as Glenn MAFNAS. Detective Udui logged into the Facebook account of Y.B. and took screen shot images of all the instant messages between Y.B. and RUBEN.  Detective Udui also logged into the Facebook account of RUBEN and took screen shot images of all the instant messages between him and Y.B.

13.      On January 4, 2016, Detective Udui provided your Affiant with a DVD-R relating to this sexual assault of a minor allegation.  On January 6, 2016, your Affiant conducted a review of the information contained on the DVD-R.  The DVD-R consisted of: (a) screenshots of RUBEN's Facebook Messenger messages to Y.B.; (b) screenshots of RUBEN's Facebook timeline; (c) screenshots of Y.B's Facebook Messenger messages to RUBEN; and (d) one video clip of a female masturbating (presumed to be Y.B.).

14.      Your affiant reviewed the Facebook messages and noted that on December 13, 2015, RUBEN and Y.B. began communicating via Facebook Messenger.  On December 13, 2015, RUBEN asked her what grade she was in and Y.B. replied 8th.   On December 14, 2015, RUBEN asked Y.B. how old she was and Y.B. replied fourteen (14).  On December 14, 2015, RUBEN asked Y.B. to meet him at the Christmas in the Marianas festivities on December 19, 2015, because he really wanted to see her.  On December 14, 2015, RUBEN told Y.B. he loved her and Y.B. told RUBEN she loved him, too.  RUBEN and Y.B. said I love you in a romantic way numerous times to each other throughout the two (2) week Facebook Messenger communication.   On December 15, 2015, RUBEN asked Y.B. what her boob size was and asked her to send him a picture of her breasts.  Y.B. responded she would send him a picture later because people were still awake in her house.

15.     Using Facebook messenger, on December 16, 2015, RUBEN asked Y.B. to send him another picture. Y.B. sent RUBEN a selfie of her in the bathroom. RUBEN asked Y.B. was she in the bathroom, which she replied yes. RUBEN then again asked Y.B. to show him her breasts. Y.B. responded with or without her bra on and RUBEN responded both. Y.B. sent RUBEN a picture of her in the bathroom standing in a white bra with her stomach exposed. Y.B. then sent RUBEN a picture of her in the bathroom with no bra or shirt on with both breasts exposed. After receiving the pictures, RUBEN asked Y.B. if he could see her vagina. Y.B. said she would show him later that she was tired of walking to the restroom. RUBEN told Y.B. he would show her his if she showed him hers. RUBEN told Y.B. he was so hard at the moment and asked her did she want to see it. On December 16, 2015, RUBEN sent Y.B. a photograph of him standing with an erect penis. RUBEN sent a second picture of him standing with a flaccid penis with what appears to be white ejaculation on the floor. RUBEN sent Y.B. a third picture of him standing with a flaccid penis. After sending Y.B. the nude photos of himself, RUBEN told Y.B. it was her turn to send him nude photos of her.

16.     On December 16, 2015, RUBEN asked Y.B. whether she was a virgin and to show him her vagina. Y.B. sent RUBEN a picture of her vagina area from her lower waist to her upper thighs. RUBEN told Y.B. to open her vagina so he could see the vulva of her vagina and RUBEN instructed her to spread her legs and open her vagina area. Y.B. sent RUBEN another picture of her vagina area with her legs spread opened so the clitoris was exposed. RUBEN instructed Y.B. to open her vagina with her hands and to play with her vagina. RUBEN told Y.B. to open her vagina and to finger herself. Y.B. sent RUBEN a video clip through Facebook Messenger of her playing with her vagina with her finger as instructed by RUBEN. RUBEN told Y.B. he was unable to play the video clip of her masturbating, so Y.B. resent the video clip to RUBEN. RUBEN told Y.B. he had to download the video clip and asked her to take another picture of her opening her vagina with her hand. RUBEN asked her to show him her "wet pussy and ass." Y.B. sent RUBEN a picture of her legs spread with her vagina exposed with two (2) fingers spreading her vulva apart. Y.B. also sent a picture of her standing up with a gray shirt on and no panties or pants which exposed her naked buttocks. On December 16, 2015, RUBEN sent Y.B. two (2) additional photos of his flaccid penis.

17.     Your Affiant visited RUBEN and Y.B.'s Facebook pages on January 29, 2016, and both accounts were still active.   The web address of RUBEN's account was https://www.facebook.com/glenn.mafnas.   The web address of Y.B.'s account was https://www.facebook.com/████████.

## TECHNICAL BACKGROUND

18.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

19.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

20.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

21.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these

privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

22.      Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

23.      Facebook allows users to upload photos and videos.  It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video.  When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

24.      Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook.  These chat communications are stored in the chat history for the account.  Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

25.      If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

26.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

27.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

28.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

29.     Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

30.     The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page.  Gifts cost money to purchase, and a personalized message can be attached to each gift.  Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

31.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

32.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

33.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile.  The "Neoprint" for a given user can include the following information from the user's profile:  profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member,

including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

34.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

35.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

36.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

37.     Your Affiant anticipates executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I

of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## **CONCLUSION**

38.    Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that on the computer systems in the control of Facebook there exists evidence of violations of 18 U.S.C. §§ 2252(a)(2) and 1470.   Accordingly, a search warrant is requested.

39.    This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).   Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

40.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

41.    I have shown this affidavit and the accompanying search warrant to Assistant United States Attorney Garth R. Backe, and he informs me that the affidavit is in proper form.

Respectfully submitted,

Everette Route, Special Agent
Homeland Security Investigations

Subscribed and sworn to before me on
February _2_, 2016.

UNITED STATES DISTRICT JUDGE

11

# ATTACHMENT A

## Property to Be Searched

This warrant applies to information associated with:

**https://www.facebook.com**

for the time period of December 11, 2015 (0000 hrs. EST) through the Present that is stored at premises owned, maintained, controlled, or operated by Facebook, a company headquartered at 151 University Avenue, Palo Alto, California, 94301.

A-1

## ATTACHMENT B

### Particular Things to be Seized

### I.    Information to be disclosed by Facebook

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, Inc. ("Facebook"), including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for the user ID/web address listed in Attachment A:

(a)    All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)    All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c)    All Photoprints, including all photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them;

(d)    All Neoprints, including profile contact information; Mini-Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected

B-1

"Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)    All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

(f)    All "check ins" and other location information;

(g)    All IP logs, including all records of the IP addresses that logged into the account;

(h)    All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(i)    All information about the Facebook pages that the account is or was a "fan" of;

(j)    All past and present lists of friends created by the account;

(k)    All records of Facebook searches performed by the account;

(l)    All information about the user's access and use of Facebook Marketplace;

(m)    The types of service utilized by the user;

(n)    The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(o)    All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(p)    All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

## II.     Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 18, United States Code, 18 U.S.C. §§ 2252(a)(2) and 18 U.S.C. § 1470 involving Glenn RUBEN, Jr. (a/k/a Glenn MAFNAS) ("RUBEN"), including information pertaining to the following matters:

(a) Any and all communications and materials sent between RUBEN and Y▇▇ B▇ (a/k/a ▇▇▇▇▇▇) ("E▇"), as well as any and all communications or materials sent between RUBEN or B▇ and other individuals, demonstrating or discussing RUBEN's sexual interest in minors.

(b) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

(c) The identity of the person(s) who communicated with the user ID about matters relating to the sexual exploitation of children, including records that help reveal their whereabouts.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS
## RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct.  I am employed by Facebook, and my official title is _____.  I am a custodian of records for Facebook.  I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of Facebook, and that I am the custodian of the attached records consisting of _____(pages/CDs/kilobytes).  I further state that:

    a.    all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

    b.    such records were kept in the ordinary course of a regularly conducted business activity of Facebook; and

    c.    such records were made by Facebook as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.

_____    _____

Date    Signature